Frances C. WHEELER, Plaintiff,

v.

DYNAMIC ENGINEERING, INC. and Office of Civilian Health and Medical Program of the Uniformed Services (CHAMPUS), Defendants.

No. 4:94cv16.

United States District Court,
E.D. Virginia,
Newport News Division.

April 4, 1994.

---

**460**

Timothy G. Clancy, Cummings, Hatchett, Moschel & Patrick, Hampton, VA and Robert E. Hoskins, Foster & Foster, Greenville, SC, for plaintiff Frances C. Wheeler.

Robert J. Barry and Richard C. Mapp, III, Kaufman & Canoles, Norfolk, VA, for defendant Dynamic Engineering, Inc.

Michael A. Rhine, U.S. Attys. Office, Norfolk, VA, for defendants Office of Civilian Health and Medical Program of the Uniformed Services (CHAMPUS).

## MEMORANDUM OPINION & ORDER

CLARKE, District Judge.

In this case Plaintiff, a victim of advanced breast cancer, seeks a declaratory judgment that her health insurance covers a treatment recommended by her oncologist which may eradicate her cancer and save her life: high dose chemotherapy with peripheral stem cell rescue (HDC/PSCR).

Plaintiff has her primary health insurance coverage through the Defendant Dynamic Engineering, Inc. ("Dynamic") her husband's employer. Plaintiff's secondary health insurance coverage is through the Defendant Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS") due to her husband's prior military service. Plaintiff claims that she is entitled to coverage for the HDC/PSCR treatment from either Dynamic, or alternatively, from CHAMPUS.[1]

Dynamic contends that it amended the terms of its employee health plan as of January 1, 1994 and in doing so eliminated coverage for HDC/PSCR treatment. The Court concludes that the modification, which was implemented after Plaintiff had been diagnosed with Stage IV breast cancer and after she had commenced the multi-stage HDC/PSCR therapy, could not be applied retroactively to deny coverage for Plaintiff's treatment.

CHAMPUS claims that HDC/PSCR for the treatment of Stage IV breast cancer is an investigational procedure and, as such, is not covered by its policy which excludes investigational treatment.[2] The Court finds that Dynamic and CHAMPUS denied coverage for the Plaintiff's treatment in an unreasonable, arbitrary and capricious manner. Accordingly, the Court **GRANTS** Plaintiff the declaratory relief she seeks against both Defendants.

## I. *Proceedings to Date*

Plaintiff filed this action pursuant to 29 U.S.C. § 1132 seeking temporary and permanent injunctive relief on February 23, 1994.[3] On March 8, 1994, this Court held a hearing on Plaintiff's motion for a preliminary injunction. At that time, the Court did not rule on Plaintiff's motion. Instead, the court expe-

dited the trial and scheduled a hearing on the merits for March 24, 1994.

As scheduled, the trial commenced on March 24, 1994 and lasted two days. Plaintiff presented testimony from six witnesses, including four experts, and introduced documentary evidence. Plaintiff's experts were: Dr. Bruce W. Booth, the Plaintiff's treating oncologist, Dr. William H. West, Dr. Elizabeth Ann Harden, and Dr. Laurence M. Lewkow. The latter three doctors are expert oncologists. Plaintiff, her husband, Terry Wheeler and Dr. Booth testified as fact witnesses.

Dynamic did not introduce any expert testimony, however, in addition to Dynamic's documentary evidence, James E. Marchesani, Dynamic's Director of Administration and Tracy McElligot, a Blue Cross/Blue Shield of Virginia representative testified as fact witnesses. Defendant CHAMPUS introduced the *de bene esse* depositions of Dr. Thomas V. Holohan, M.D., Director of the Office of Health Technology Assessment and Dr. Bruce D. Cheson, M.D. of the National Cancer Institute in addition to its documentary evidence.

## II. *Facts*

The Court finds from a preponderance of the evidence the following facts. Plaintiff, Frances Wheeler, is a fifty-one year old woman who suffers from advanced breast cancer. In 1985, Plaintiff was initially diagnosed as having breast cancer. Soon afterwards, Plaintiff had a mastectomy and follow-up chemotherapy treatments and became asymptomatic. Plaintiff managed the disease relatively well until November, 1993 at which time she was diagnosed as having Stage IV breast cancer, i.e., cancer which has spread through many areas of her body.

---

1. CHAMPUS coverage is always secondary to other applicable insurance coverage. In the present case, CHAMPUS coverage would only become effective for this claim if the Court finds that Dynamic's plan did not cover the claim.

   Although the Court concludes that Dynamic's policy covers the Plaintiff's treatment, this opinion also addresses whether the CHAMPUS policy covers the dispute. In the event of subsequent appellate action, the Court wishes to avoid the need for further hearings on that question.

2. Dynamic originally argued that the Plaintiff's treatment was experimental and therefore not covered under their health insurance. Dynamic has since withdrawn this argument.

3. Plaintiff's case against Dynamic is governed by the Employee Retirement and Income Security Act of 1974 ("ERISA"), 29 U.S.C.A. § 1001 *et seq.,* and her case against CHAMPUS is governed by 32 C.F.R. § 199 *et seq.*

In November, 1993, Plaintiff's treating physician, Dr. Bruce W. Booth, advised Plaintiff that her best chance for survival and management of the disease was to receive HDC/PSCR treatment. This treatment is quite expensive and typically costs between $90,000 and $150,000.

High dose chemotherapy (HDC) treatment involves administering the same chemotherapeutic agents used in standard chemotherapy but at higher dosages. This more potent form of chemotherapy is thought to be more effective than standard dose chemotherapy at killing the disease. The administration of dose-intense chemotherapy, however, is also more likely to kill healthy cells, including white blood cells. White blood cells are the primary component of the body's immune system.

Because of the potential damage to a patient's immune system, HDC may be lethal if not accompanied by one of two alternative support procedures which help the body recover from the onslaught of chemicals. The two procedures are autologous bone marrow transplant support (ABMT) and peripheral stem cell rescue support (PSCR). In HDC/ABMT a patient's stem cells—cells which generate white blood cells—are harvested from the patient's bone marrow and are frozen. The patient is then administered high doses of chemotherapeutic agents to destroy the cancer cells. The frozen stem cells are thawed and reinfused into the patient after the chemicals have been administered.

Stem cells are also located in the circulating, or peripheral, blood. In HDC/PSCR, the procedure at issue in this litigation, stem cells are harvested from a patient's bloodstream rather than from bone marrow. Prior to the administration of the HDC, blood is withdrawn from the patient and stem cells are separated from the blood by a process known as leukapheresis. Stem cells are then frozen and stored until after the administration of the HDC. After the HDC phase, the stem cells are thawed and reinfused into the patient's bloodstream.

On December 15, 1993, Plaintiff began receiving standard dose chemotherapy. Beginning on March 14, 1994, Plaintiff was administered Taxol, a drug that fights cancer in a different manner than standard chemotherapeutic agents. Pursuant to the protocol under which the Plaintiff is being treated, HDC/PSCR patients must receive standard chemotherapy and Taxol prior to the administration of dose intense therapies. Plaintiff's treatment is being administered by Dr. Booth, in a local outpatient setting.

Plaintiff's husband, Terry Wheeler is employed by Dynamic. Dynamic provides health care coverage to its employees and their families by means of a self-funded group insurance plan.[4] Eligible employees and their families receive health care benefits to the extent of the coverage specified by the plan. Plaintiff has been a beneficiary under Dynamic's employee health plan since her husband began working at the company in 1987.

Until December 31, 1993, E & E Benefit Plans served as claims administrator of Dynamic's plan. Prior to that date, a document entitled "Medical Insurance Plan" had been provided to Dynamic's employees, including the Wheeler's, to explain their health benefits. The Medical Insurance Plan states that coverage is provided for FDA approved drugs, hospital expenses, doctors' charges and other outpatient procedures. On page VII–7 of the document, it states that there is no coverage for "[n]on-prescription or experimental drugs, vitamins and nutrition supplements which do not require a prescription under the law." The document also states:

Medical reimbursement claims should be filed as soon as they are incurred ... claim forms may be obtained from the personnel office or from the office of the employee benefits administrator. Forms should be obtained promptly; in advance of treatment or service if possible.

---

4. Dynamic's group health insurance plan is administered pursuant to ERISA, 29 U.S.C. § 1101 *et seq.* As a self-funded plan, Dynamic pays the covered health care expenses of participants out of corporate assets. A third party administrator processes claims under Dynamic's plan. If the claims of one individual exceed $35,000, Dynamic receives reimbursement for the excess claimed under a reinsurance policy issued by a commercial insurance carrier.

In early December, 1993, James E. Marchesani, Dynamic's Director of Administration decided not to renew its reinsurance agreement with its 1993 provider and to enter into a new reinsurance agreement with Blue Cross/Blue Shield of Virginia ("Blue Cross"). Mr. Marchesani also decided to modify the coverage available under its health plan in accordance with a design recommended by Blue Cross and memorialized under "Master Group Contract No. 21404."

On December 17, 1993, Tracy McElligot, a Blue Cross representative conducted an orientation meeting for Dynamic's employees to describe the modifications to Dynamic's health plan which was to become effective on January 1, 1994. At the meeting, Ms. McElligot distributed to Dynamic's employees, including Terry Wheeler, a brochure entitled "Key Care II." This brochure contained information concerning the available benefits under the plan, deductible and co-payment amounts and applicable exclusions.

Dynamic claims that effective January 1, 1994, Blue Cross replaced E & E Benefit Plans as Dynamic's claims administrator. The Master Group Contract, which serves as the Dynamic Medical Plan document as well as the reinsurance agreement with Blue Cross, specifically excludes coverage of HDC/PSCR for the treatment of breast cancer. Item 53 of the Master Group Contract's Exclusion section reads as follows:

Benefits for the following will not be provided:

Autologous bone marrow transplants or other forms of stem cell rescue (in which the patient is the donor), together with high dose chemotherapy or radiation, and any resulting medical complications are not covered. The following are exceptions: [several diseases are listed; Stage IV breast cancer is not among them.]

.     .     .     .     .

Autologous bone marrow transplantation or other forms of stem cell rescue, together with high dose chemotherapy and/or radiation, and any resulting medical complications for all other cases are not covered. These include but are not limited to the following:

.     .     .     .     .

* Breast cancer;

.     .     .     .     .

The Court does not agree with Dynamic that the Plaintiff's claim is governed by the Blue Cross Master Group Contract which Mr. Marchesani testified became effective on January 1, 1994. Dynamic did not sign that policy into effect until March 4, 1994 and the Summary Plan Description based on that plan was not issued until the day of trial. The Court does not find it necessary to find the exact date the Plan changed. However, it is highly doubtful that Mr. Marchesani who was Dynamic's agent for the purpose of determining the terms of a new plan could have adopted a plan on January 1, 1994 when the evidence produced at trial clearly shows that he had no idea what was in the proposed Blue Cross plan on that date other than that prescription drugs and doctor's office visits could be reimbursed more rapidly.

Terry Wheeler is also retired from the Air Force. Both he and the Plaintiff receive CHAMPUS secondary coverage. The CHAMPUS policy provides coverage for the administration of chemotherapeutic agents. CHAMPUS' governing regulations provide a general coverage exclusion for investigational procedures, as set forth in 32 C.F.R. § 199.-4(g)(15):

Not in accordance with accepted standards, experimental or investigational. Services and supplies not provided in accordance with accepted professional medical standards; or related to essentially experimental or investigational procedures or treatment regimens.

On December 13, 1993, Plaintiff requested a pre-treatment coverage commitment from both Defendants. On December 16, 1993, CHAMPUS denied the Plaintiff's claim reasoning that, "[i]n the absence of published randomized prospective trials (Phase III trials), CHAMPUS must continue to consider this therapy as investigational for the treatment of breast carcinoma."

Dynamic did not respond to the Plaintiff's request for coverage for over a month and a

half. By letter of January 28, 1994, Dynamic's claims administrator, Blue Cross, informed Plaintiff that HDC/PSCR for the treatment of breast cancer was specifically excluded under the terms of her policy.

### III. *Standard of Review*

#### A. *Defendant Dynamic*

Typically, when a Court reviews a denial of benefits in an action under 29 U.S.C. § 1132 the standard of review enunciated in *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 109, 109 S.Ct. 948, 953–54, 103 L.Ed.2d 80 (1989), applies. In *Firestone*, the Supreme Court held that a denial of benefits challenged under ERISA is to be reviewed under a *de novo* standard unless the benefit plan expressly grants the plan administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. The arbitrary and capricious standard of review is appropriate only where an ERISA administrator is given such discretionary authority. *Id. See also Pirozzi v. Blue Cross–Blue Shield of Virginia*, 741 F.Supp. 586, 589 (E.D.Va.1990).

Analysis would properly begin with the terms of the Plan itself. In the present case, the relevant plan documents conflict concerning whether Dynamic adequately reserved discretionary authority. Under the terms of the Medical Insurance Plan which was in effect for 1993, Dynamic did not expressly reserve discretionary authority to determine eligibility for benefits or to construe the terms of the plan. However, the Master Group Contract with Blue Cross states on page one that the "Plan Administrator (Dynamic) has ultimate responsibility for claim determinations and payments made under the Plan."

The testimony Dynamic supplied at trial did little to clarify whether Dynamic adequately reserved discretionary authority. James Marchesani, Dynamic's Director of Administration, testified that Dynamic served as Plan Administrator and that the company designated him to administer the plan. Mr. Marchesani testified that Dynamic, as Plan Administrator, had final authority to determine whether the health plan covered a contested claim. Mr. Marchesani testified that he had several meetings with Mr. Wheeler before he bound Dynamic to an agreement with Blue Cross. During those meetings, Mr. Wheeler inquired whether his wife's breast cancer treatment would be covered by Dynamic's new health insurance plan. Plaintiff's doctors had sent Mr. Marchesani the Plaintiff's medical records and a description of the treatment to be given. During his testimony, Mr. Marchesani revealed that he was unable to determine whether the Plaintiff's treatment would be covered. Mr. Marchesani forwarded the records to Blue Cross and waited for Blue Cross to decide whether the Plaintiff's treatment was covered. Mr. Marchesani's actions are inconsistent with Dynamic's position that he retained discretionary authority over claims determinations. Logic dictates a finding that a person cannot · exercise discretion over something he knows nothing about.

In the present case, however, the parties are not contesting the terms of the Blue Cross plan coverage. The parties are in agreement that if the Medical Insurance Plan governs the Plaintiff is entitled to coverage for the HDC/PSCR treatment; if the Master Group Contract controls the Plaintiff's treatment is excluded. Rather, the Court is called upon to determine whether the terms of the Medical Insurance Plan or the terms of the Master Group Contract governed the Plaintiff's claim for treatment. Because the Court's analysis will not be called on to construe the terms of a health plan but will instead determine which plan applies, the Court need not grant substantial deference to Dynamic's denial of the Plaintiff's claim. *De novo* review is appropriate for this determination. However, even if substantial deference did apply, this Court would find for the reasons discussed below that Dynamic was unreasonable, arbitrary and capricious in denying the Plaintiff's claim.

#### B. *Defendant CHAMPUS*

The proper standard of review in the action against CHAMPUS is the arbitrary and capricious standard. *Woods Psychiatric Institute v. United States*, 925 F.2d 1454 (Fed.Cir.1991).

## IV. Analysis

### A. Defendant Dynamic

As was already discussed, Plaintiff was diagnosed with Stage IV breast cancer in November, 1993. Plaintiff submitted her claim for coverage with Dynamic on December 13, 1993. She began receiving standard dose chemotherapy on December 15, 1993 in order to prepare her body to withstand the later high dose treatment. Dynamic concedes that the terms of the Medical Insurance Plan were in effect in mid-December. Moreover, Dynamic does not dispute that prior to December 31, 1993 its health plan did not exclude coverage for HDC/PSCR treatment for breast cancer.

Instead, Dynamic relies upon its claimed January 1, 1994 coverage modification as its rationale for denying Plaintiff's claim: Dynamic contends that the terms of the Master Group Contract with Blue Cross specifically exclude stem cell rescue performed in connection with breast cancer treatment. Dynamic asserts that it changed the terms of its plan on January 1, 1994 when it changed plan administrators. Dynamic believes that the exclusion in the Master Group Contract bars coverage of the Plaintiff's treatment.

Plaintiff argues that the terms of the Medical Insurance Plan govern Plaintiff's claim. Plaintiff questions the effect of any modification of coverage implemented during the course of her multi-stage treatment upon her claim which had been submitted prior to the modification.[5]

### When Did Treatment Begin?

█ As a threshold matter, the Court must determine at what point the Plaintiff commenced her HDC/PSCR treatment. It is undisputed that the Plaintiff began receiving standard dose chemotherapy on December 13, 1993. Dynamic disputes the Plaintiff's contention that the HDC/PSCR treatment began in mid-December when the Plaintiff began receiving standard dose chemotherapy. Dynamic contends that the Plaintiff's treatment did not begin until the administration of Taxol commenced on February 1, 1994.

Plaintiff's treating physician, Dr. Booth testified that HDC/PSCR is a multi-stage procedure consisting of four distinct phases of treatment. Dr. Booth testified that in the first stage, standard doses of chemotherapeutic agents are administered to the patient. During the second stage, a patient is administered the drug Taxol, which fights cancer in a different manner than the standard chemical agents. Next, in the consolidation phase, Cyclophosphamide and VP-16 are administered to further fight the cancer and to help the patient make cells for when the dose-intense therapy begins. Then, high dosages of chemotherapeutic agents are administered to the patient. Finally, the stem cells are reintroduced. Dr. Booth commented that the super high dose therapy cannot be administered until each of the three preceding phases are completed.

Dr. William West, a Board Certified oncologist who authored the HDC/PSCR protocol under which the Plaintiff is being treated also testified at trial. Dr. West testified that the theory behind the use of HDC/PSCR treatment is to attack the cancer with "four different types of drugs" so that the cancer would be unable to develop a particular resistance. Dr. West emphasized that standard dose chemotherapy constituted the first stage of HDC/PSCR treatment.

Dynamic did not introduce any expert testimony to rebut the views of Plaintiff's experts concerning when HDC/PSCR treatment begins. Instead, in support of its position, Dynamic points to the December 13, 1993 request for coverage letter sent to Dynamic from the Plaintiff's doctors. That letter states, "[t]he nature of this illness re-

---

5. Plaintiff advances several alternative theories as to why Dynamic is required to pay for Plaintiff's treatments. Among the other arguments advanced are: (1) limitations in the Medical Insurance Plan operate to prevent Dynamic from changing the terms of the plan whenever it chooses; (2) the terms of the Key Care II brochure (which does not specifically exclude HDC/PSCR for breast cancer) apply because the brochure served as the Summary Plan Document (SPD). Because the Court agree with Plaintiff's argument that Dynamic can not amend its Plan to exclude coverage once Plaintiff began treatment, the Court does not address these alternative arguments.

quires that treatment begin on February 1, 1994." The letter goes on to state:

The plan of treatment that has been prescribed for Mrs. Wheeler includes the following phases:

I. Administration of Taxol and Cisplatin and growth factors

.    .    .    .    .

II. Harvest of peripheral blood stem cells through leukapheresis and subsequent cryopreservation of these stem cells.

.  III.  Administration of high-dose antineoplastic drugs to eliminate residual microscopic disease.

IV. Reinfusion of the stem cells.

V. Hospital admission for approximately 12–15 days for supportive management of immunosuppression and other expected side effects of high dose chemotherapy.

Dynamic also argues that the calendar contained in the protocol under which the Plaintiff is being treated begins with the administration of Taxol and does not contain a section which charts the administration of standard chemotherapy.

Despite the evidence highlighted by Dynamic, the Court finds that the Plaintiff has demonstrated, through expert testimony, that HDC/PSCR begins with the standard dose chemotherapy phase. The Plaintiff has introduced unrebutted expert testimony from two oncologists that HDC/PSCR treatment begins with standard dose chemotherapy. Furthermore, the protocol under which the Plaintiff is being treated states on page nine that Patients should receive standard chemotherapy prior to receiving the dose intense program. Likewise, on page eleven, the protocol lists, as a requirement for participation in the treatment, that the patient be stable or responding to standard dose chemotherapy.

### Which Plan Applies?

Having determined that the Plaintiff began the HDC/PSCR treatment on December 13, 1993, the Court must next turn its attention to the central issue in the case: may Dynamic modify its health plan to exclude coverage for the Plaintiff's HDC/PSCR treatment after the Plaintiff had already commenced her course of treatment and after the Plaintiff had already applied for a coverage commitment from Dynamic?

In support of its position, Dynamic argues that ERISA health plans, are not vested entitlement for employees and may be unilaterally terminated, changed or modified by an employer at any time provided the changes are made in compliance with ERISA and the terms of the plan. Dynamic further argues that an employer has the right to modify its health insurance plan even where a participant is deprived of coverage for treatment prescribed as part of a continuing course of treatment for an illness or condition which began prior to the modification of the plan.

■ This Court agrees with the well-established principle cited by Dynamic that an employer may modify health coverage so long as an employee's right to coverage for treatment has not vested. *See, e.g., Doe v. Group Hospitalization & Medical Services,* 3 F.3d 80, 84 (4th Cir.1993). However, this Court disagrees with Dynamic's contention that an employer may cut off health benefits in the middle of an employee's course of treatment. Although an employer has the right to change the terms of its plan such a change may only operate prospectively.

■ The Circuit Courts of Appeal have handed down conflicting authority concerning whether an employer may alter an ERISA health plan to exclude coverage after a beneficiary has commenced a particular treatment.

In *McGann v. H & H Music Company,* 946 F.2d 401 (5th Cir.1991) and *Owens v. Storehouse, Inc.,* 984 F.2d 394 (11th Cir.1993) the Fifth and Eleventh Circuits respectively held that an employer may modify its health insurance plan after a beneficiary of a plan submitted a claim for coverage. Both *McGann* and *Owens,* involved cases where employers reduced the maximum amount of coverage available for Acquired Immune Deficiency Syndrome (AIDS) and related illnesses after employees had submitted AIDS-related claims under the plan. Plaintiffs brought suit claiming that the coverage limitation discriminated against them in violation

of section 510 of ERISA.[6] The Fifth Circuit and Eleventh Circuits, respectively, dismissed the suits holding that the Plaintiffs had failed to demonstrate prohibited discrimination.

Although the *McGann* and *Owens* cases support Dynamic's position, the cases are not directly analogous to the situation presently before the Court. *McGann* and *Owens* involve challenges based upon section 510 of ERISA. Essentially, both cases are discrimination cases. The question of whether coverage had been amended after a course of treatment had commenced was addressed in a more cursory fashion.

The Third Circuit in *Confer v. Custom Engineering Co.*, 952 F.2d 41 (3rd Cir.1991), addressed issues more closely related to the present litigation. In *Confer*, the court held that an employer cannot modify its health plan retroactively to exclude coverage for treatment that has already begun. In *Confer* the plaintiff sought coverage under an employee health plan for injuries he suffered in a motorcycle accident. The employer had orally announced to its employees that the company's new health plan would exclude coverage for motorcycle accidents. However, the written plan in effect at the time did not exclude coverage for motorcycle related injuries. After the plaintiff's accident, the employer prepared an amendment to the written plan and attempted to backdate its effectiveness to a date prior to the plaintiff's accident. Based on the backdated amendment, the employer denied coverage for all of the plaintiff's motorcycle related injuries. Holding that an employer's modification of the terms of its plan could only operate prospectively, the Third Circuit wrote:

> the Plan's written instrument did not exclude Confer's claim at the time of his accident ... neither the speech nor the bulletin board announcement could effectively change that written instrument. Only a formal written amendment, executed in accordance with the Plan's own pro-

cedure for amendment could change the Plan. Moreover, the change by means of a formal amendment could operate only prospectively.

At least one district court in the Fourth Circuit has recently cited *Confer* with approval. In *Ragucci v. Blue Cross/Blue Shield of North Carolina*, C.A. # 2:93CV297, 1994 WL 218235 (W.D.N.C., January 7, 1994) the Plaintiff sought coverage for HDC/PSCR for the treatment of multiple myeloma. The Plaintiff submitted a request for coverage to the Defendant on June 1, 1993 for treatment which was scheduled to begin on July 5, 1993. On June 21, 1993, the Defendant initially denied the claim. The Plaintiff sent a second letter to Defendant asking for reconsideration of the decision, and Defendant again denied the Plaintiff's claim. While the parties disputed the coverage, Defendant enacted an amendment to its plan on August 1, 1993, which specifically excluded HDC treatment relating to PSCR. On September 1, 1993, Defendant sent another letter to Plaintiff, explaining that the prior reasons for denying coverage were incorrect and that coverage could not be provided because HDC was specifically excluded under the policy.

The *Ragucci* court granted the Plaintiff a preliminary injunction thereby restraining the Defendants from denying coverage for Plaintiff's HDC treatment. Chief Judge Voorhees held:

> Since Plaintiff filed his initial claim for pre-certification on June 1, 1993, at least two months prior to the enactment of the August 1 Amendment, and had obviously suffered the injuries at issue prior to that time, this Court finds that the August 1 Amendment could not be applied retroactively to deny coverage for Plaintiff's HDC treatment. *See Confer v. Custom Engineering Co.*, 952 F.2d 41 (3rd Cir.1991) (change to employee benefit plan by means of a formal amendment could operate only prospectively). Therefore, coverage for Plaintiff's HDC treatment must be deter-

**6.** Section 510 of ERISA provides, in part:
"It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled

under the provisions of an employee benefit plan, ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan ..." 29 U.S.C. § 1140.

mined under the unamended policy as it existed at the time of Plaintiff's initial claim.

*Id.* at 4.

This Court agrees with the Third Circuit and the Western District of North Carolina that an employer's amendment to its health plan cannot be applied retroactively to deny coverage for Plaintiff's treatment. Accordingly, Plaintiff's claim for coverage is governed by the terms of the Medical Insurance Plan. The Court finds that Dynamic improperly denied coverage for Plaintiff's ongoing HDC/PSCR treatment based on the January 1, 1994 amendment to coverage.

### B. *Defendant CHAMPUS*

■ Defendant CHAMPUS contends that two exclusions in its policy preclude coverage of the Plaintiff's treatment. First, CHAMPUS argues that an exclusion for autologous bone marrow transplantation applies to the HDC/PSCR procedure. The CHAMPUS policy manual, Volume I, Chapter III, Section 6.38245.1(d) states:

Autologous bone marrow transplantation is covered to support high dose cytoxic therapy in the treatment of the following malignancies: (several diseases are listed; Stage IV breast cancer is not among them.)

Exceptions: A. Benefits for all types of bone marrow transplantation are excluded for treatment of conditions other than those discussed in this policy; however, benefits may be allowed on an individual case basis for other conditions that are not considered experimental or investigational with the approval of the Director of CHAMPUS.

The evidence before the Court is clear that Plaintiff is not having a bone marrow transplant, rather, Plaintiff is having a peripheral stem cell rescue. Although the two procedures are similar in that they both provide support for a patient receiving high dose chemotherapy, they two are distinct procedures. In bone marrow transplantation, marrow is collected from a patient. However, the Plaintiff is not having her marrow collected. She will have white blood cells removed from her blood stream and rein-

fused after the administration of high dose chemotherapy. The section cited by CHAMPUS excluding coverage for autologous bone marrow transplantation does not apply to Plaintiff's case.

■ The second exclusion which CHAMPUS seeks to apply is one for experimental and investigational treatments. In order for the Court to determine whether or not HDC/PSCR qualifies as an experimental or investigational procedure under the CHAMPUS policy, the Court must look to the specific language of the contract.

The general exclusion for experimental or investigational procedures in the CHAMPUS policy is set forth in 32 C.F.R. § 199.4(g)(15):

*Not in accordance with accepted standards, experimental or investigational.* Services and supplies not provided in accordance with accepted professional medical standards; or related to essentially experimental or investigational procedures or treatment regimens.

The CHAMPUS policy defines experimental as follows:

Medical care that essentially is investigatory or an unproven procedure or treatment regimen ... that does not meet the generally accepted standards of usual professional medical practice in the medical community....

At trial, Plaintiff presented the testimony of four oncologists—the Plaintiff's treating physician and three experts. The experts each testified that they were convinced to a reasonable degree of medical certainty that HDC/PSCR treatment is not an experimental or investigational treatment. A summary of the Plaintiff's expert testimony follows.

Dr. West opined that refinements to the HDC/PSCR procedure were still necessary, however the treatment could neither be described as investigational nor experimental. Dr. West testified that the treatment existed for nearly ten years and had been generally accepted as a private community based treatment for the past five years. Dr. West described how the prevalence of the treatment was rapidly increasing in the United States.

Dr. Lawrence Lewkow of the Virginia Cancer Institute testified that he had extensive HDC experience. Dr. Lewkow testified that six medical centers provide HDC therapy in North Carolina and presently four centers offer such treatment in Virginia. Dr. Lewkow testified that HDC offered women with Stage IV breast cancer the greatest chance for a long term response and provides women with the disease the opportunity to go without treatment for a substantial period of time. Dr. Lewkow testified that HDC/PSCR was a procedure widely accepted by experts in the field of oncology and was considered standard care by oncologists. Dr. Lewkow stated that to some extent the "investigation never ends" in the treatment of cancer, however, HDC/PSCR could not be considered an experimental procedure.

Dr. Elizabeth Ann Harden, Board Certified in Internal Medicine and Oncology, is currently in private practice in the Hampton Roads area. Dr. Harden recently testified in the Virginia Legislature as part of the Breast Cancer Insurance Reform Task Force. Dr. Harden testified that HDC is a widely accepted procedure in Virginia. Dr. Harden stated her opinion that, to a reasonable degree of medical certainty, HDC was not an experimental procedure. She further testified that the treatment offered a patient a superior quality of life and the best chance to live free of chemotherapy in the long run.

CHAMPUS' evidence does not contradict these expert conclusions. CHAMPUS submitted the *de bene esse* depositions of Dr. Thomas Holohan and Dr. Bruce M. Cheson for the court's consideration. This testimony does not rebut the Plaintiff's showing that HDC/PSCR treatment is not an experimental procedure. In fact, CHAMPUS expert testimony strengthens the Plaintiff's case. In his deposition, Dr. Cheson admits that he accepts HDC/PSCR when administered in a clinical trial. The reasons he wants the procedure carried out within a clinical trial is so that proper records will be kept to improve the administration of the procedure to patients.

The Court, having heard the testimony of the expert witnesses and having thoroughly reviewed all of the exhibits, concludes that CHAMPUS' denial of coverage for HDC/PSCR for the treatment of Stage IV breast cancer is unreasonable, arbitrary and capricious.[7]

## VI. *Conclusion*

For the reasons discussed above, this Court FINDS that the Plaintiff is entitled to coverage for HDC/PSCR treatment for her Stage IV breast cancer under the Dynamic Engineering, Inc. plan and secondarily under the CHAMPUS plan.

IT IS, THEREFORE, ORDERED that the Plaintiff's motion for declaratory relief is GRANTED and that the Defendant Dynamic is ordered to pay the costs of the Plaintiffs treatment for Peripheral Stem Cell Rescue and for High Dose Chemotherapy in connection with the treatment of the Plaintiff's Stage IV breast cancer.

The Plaintiff has also requested that the Court order the Defendants to pay her costs, including attorneys fees incurred in this action. The Plaintiff may file such further motion with supporting documents as she deems proper.

---

7. The Court's conclusion is supported by two recent unpublished decisions. In both *Hawkins v. Mail Handlers Benefit Plan & CHAMPUS*, C.A. # 1:94CV6 (W.D.N.C. January 28, 1994) and *Gripkey v. Mail Handlers Benefit Plan & CHAMPUS*, C.A. # 3:94–378–0, 1994 WL 276265 (D.S.C. February 14, 1994) federal district courts held that CHAMPUS' denial of HDC/PSCR in the treatment of Stage IV breast cancer was arbitrary and capricious and granted the plaintiffs temporary injunctions against CHAMPUS.