97 F.3d 950
 65 USLW 2247, 20 Employee Benefits Cas. 2204
 Erin C. SMITH, Plaintiff-Appellee,
v.
OFFICE OF CIVILIAN HEALTH AND MEDICAL PROGRAM OF THE
UNIFORMED SERVICES, a subdivision of the Department of
Defense of the United States of America; William Perry, in
his official capacity as the Secretary of Defense for the
United States of America, Defendants-Appellants.
 No. 94-3744.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 9, 1995.
Reargued Feb. 8, 1996.
Decided Oct. 4, 1996.[1]
 
 Steven J. Cohen, David D. Becsey (argued), Zeigler, Carter, Cohen & Koch, Indianapolis, IN, for Plaintiff-Appellee.
 John P. Schnitker, Department of Justice, Civil Division, Appellate Section, Lowell Sturgill (argued), Washington, DC, for Defendant-Appellant Office of Civilian Health and Medical Program of the Uniformed Services.
 John P. Schnitker, Department of Justice, Civil Division, Appellate Section, Washington, DC, for Defendant-Appellant William Perry.
 Before ESCHBACH, FLAUM, and MANION, Circuit Judges.
 MANION, Circuit Judge.
 
 
 1
 Erin Smith brought this action for declaratory and injunctive relief against the Office of Civilian Health and Medical Program of the Uniformed Services (CHAMPUS) and William Perry, in his official capacity as the Secretary of Defense, challenging their refusal to pay for certain procedures recommended by Smith's doctors as treatment for her breast cancer. The district court declared that the recommended procedures were covered by CHAMPUS, held that defendants had acted arbitrarily and capriciously in concluding otherwise, and entered a permanent injunction enjoining defendants from denying Smith coverage. We reverse the district court's judgment and remand for the district court to enter an appropriate order affirming CHAMPUS' initial determination.
 
 I.
 
 2
 At the time of her complaint, Erin Smith was a forty-year-old woman diagnosed with advanced breast cancer. Smith's doctors advised her that the cancer had spread to her local lymph nodes and that high-dosage chemotherapy (HDC) coupled with peripheral stem cell rescue would give her the best chance of survival. However, neither Smith's doctors nor St. Vincent Hospital in Indianapolis where the treatment was to be administered would commence treatment until they received assurances that Smith had the means to cover the costs.
 
 
 3
 HDC involves administering the chemotherapeutic agents used in standard chemotherapy, but at higher dosages. While HDC is more effective at killing the cancer, it is also more likely to kill the patient's stem cells, the cells which generate white blood cells, the primary component of the body's immune system. To mitigate the potential damage to the patient's immune system, doctors extract (the technical term is "harvest") some of the patient's stem cells prior to administering HDC. This harvesting process, referred to as autologous stem cell rescue (ASCR), is accomplished by one of two methods: autologous bone marrow transplant support (ABMT), in which the stem cells are harvested from the patient's bone marrow, and peripheral stem cell rescue (PSCR), in which stem cells are harvested from the patient's blood stream. Under either procedure, the harvested stem cells are frozen and stored until the HDC is complete, at which time the stem cells are reintroduced into the patient. Although Smith suggests otherwise, CHAMPUS maintains that HDC/PSCR and HDC/ABMT are essentially of equal medical value in treating breast cancer. Our review of the record supports CHAMPUS's position.[2]
 
 
 4
 Married to an Air Force retiree, Smith receives her primary health care coverage through CHAMPUS. CHAMPUS was established by Congress pursuant to the Dependents' Medical Care Act, 10 U.S.C. § 1071 et seq., to provide medical and dental benefits to dependents of present and former members of the military. CHAMPUS is not an insurance program where the insurer guarantees indemnification in return for a premium. CHAMPUS beneficiaries pay no premiums. Rather, CHAMPUS is funded by annual Congressional appropriations. Another unique feature of CHAMPUS is that it is an "at risk" program, meaning that unlike traditional health insurance programs, where beneficiaries usually know whether a treatment is covered beforehand, CHAMPUS beneficiaries typically receive medical care first and then submit a claim to CHAMPUS officials for an after-the-fact ruling on coverage. The beneficiary is "at risk" in the sense that the medical services received may not qualify for payment under CHAMPUS. Coverage determinations, as well as the other day-to-day administrative duties of CHAMPUS, are charged by statute to the Secretary of Defense who has delegated these responsibilities to the Director of the Office of CHAMPUS. 32 C.F.R. §§ 199.5, 199.7.
 
 
 5
 On Smith's behalf, the oncology department at St. Vincent's Hospital filed a claim with CHAMPUS outlining the particulars of Smith's case and requesting a pre-treatment determination of whether HDC/PSCR would be covered. On August 2, 1994, Dr. David Bogner, CHAMPUS's medical director, issued an initial determination that CHAMPUS would not cover the prescribed HDC/PSCR treatment. By letter he explained that under the terms of its Congressional mandate, CHAMPUS cannot cover treatments or procedures that are considered experimental or investigational. Based on his review, HDC/PSCR fell into that category:
 
 
 6
 After careful consideration of the documents you supplied, and following review of facts presented by our oncology consultants, technology assessment panels, and the current Phase III refereed medical literature, CHAMPUS finds that it is unable to offer benefits for high dose chemotherapy and autologous stem cell rescue in the treatment of breast carcinoma.
 
 
 7
 According to Dr. Bogner, the medical literature lacked sufficient evidence of the effectiveness of HDC/PSCR for the treatment of Smith's condition:
 
 
 8
 CHAMPUS continuously reviews the current literature for outcomes of Phase III trials regarding high dose chemotherapy with autologous stem cell rescue. In the case of breast carcinoma, we have been unable to find sufficient evidence of this nature to date.
 
 
 9
 In light of this, Dr. Bogner concluded that "CHAMPUS must continue to consider this therapy as investigational for the treatment of breast carcinoma."
 
 
 10
 Yet despite referencing specific reasons for rejection, in particular the lack of Phase III trials, Dr. Bogner remained open to any documented evidence of HDC/PSCR's general acceptance as a treatment for breast cancer:
 
 
 11
 If you disagree with this CHAMPUS benefit determination, we invite you to submit pertinent documentation to support the position that high-dose chemotherapy with autologous stem cell treatment of breast carcinoma does, in fact, meet the generally accepted standards of usual professional medical practice in the general medical community.
 
 
 12
 However, he cautioned that "[w]hile personal opinions are valued, we must give the greatest weight to well-designed, Phase III, outcome based studies which have been published in refereed medical journals."[3] (Emphasis added.)
 
 
 13
 A month later, Smith's attorney filed a request for reconsideration. Acting on Dr. Bogner's invitation, counsel submitted affidavits from two of Smith's oncologists along with one from a third doctor familiar with Smith's case. Each expressed the opinion that HDC/PSCR was generally accepted in the medical community and not considered experimental for the treatment of breast cancer. Counsel also submitted two other bases for reconsideration: an article suggesting that most private insurance companies eventually approve coverage for HDC treatment and a reference to three recent district court decisions enjoining CHAMPUS from denying coverage. See Gripkey v. Mail Handlers Benefit Plan, No. 3:94-378-0, 1994 WL 276265 (D.S.C. Feb.14, 1994) (unpublished), Hawkins v. Mail Handlers Benefit Plan, No. 1:94CV6, 1994 WL 214262 (W.D.N.C. Jan.28, 1994) (unpublished), and Wheeler v. Dynamic Engineering, Inc., 850 F.Supp. 459 (E.D.Va.1994), aff'd, 62 F.3d 634 (4th Cir.1995).[4] Two of these, Gripkey and Hawkins, involved similar determinations by Dr. Bogner denying coverage for HDC/PSCR for the treatment of breast cancer. Significantly, counsel did not supply references to clinical studies indicating that HDC/PSCR was generally accepted in the medical community for the treatment of breast cancer.
 
 
 14
 After reviewing the additional documentation, on September 14, 1994, Dr. Bogner denied the request for reconsideration. The denial noted counsel's failure to produce evidence of favorable Phase III trials or any other "medical literature references upon which CHAMPUS could consider adoption of the benefit you have requested." Without convincing evidence to the contrary, Dr. Bogner stated that it remained CHAMPUS's position that HDC/PSCR for the treatment of breast cancer "has not become a national medical standard of practice, and is, therefore, not a CHAMPUS benefit."
 
 
 15
 Smith responded by filing a complaint in the district court seeking a declaration that HDC/PSCR was covered under CHAMPUS and an injunction prohibiting CHAMPUS from denying coverage. The Secretary moved for summary judgment on the grounds that the decision to deny coverage was supported by the administrative record and was not arbitrary and capricious. See 5 U.S.C. § 706(2)(A) (arbitrary and capricious standard). Following expedited proceedings, the district court entered judgment for Smith. The principal basis for its ruling was that CHAMPUS had relied on outdated medical studies in making its determination. The court held these outdated studies could not defeat the affidavits submitted by Smith's oncologists stating that HDC/PSCR was generally accepted for the treatment of breast cancer. The district court concluded that CHAMPUS's actions were arbitrary and capricious and accordingly entered an order permanently enjoining the Secretary from denying coverage for Smith's treatment.[5] The Secretary appeals.[6]
 
 II.
 A. Standard of Review
 
 16
 Under the Administrative Procedures Act ("APA"), our review of an agency decision is to determine whether the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); II Kenneth C. Davis and Richard J. Pierce, Administrative Law Treatise § 11.4 at 200 (3d ed.1994). We note that had CHAMPUS denied Smith benefits based on the results of an optional adjudicatory hearing conducted pursuant to 32 C.F.R. § 199.10(d), judicial review would focus on whether the ruling was supported by "substantial evidence." 5 U.S.C. § 706(2)(E); Camp v. Pitts, 411 U.S. 138, 141, 93 S.Ct. 1241, 1243, 36 L.Ed.2d 106 (1973) (per curiam); Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 414, 91 S.Ct. 814, 822-23, 28 L.Ed.2d 136 (1971). Smith did not request a formal adjudicatory hearing to determine the merits of her claim. Instead, she submitted her claim for an initial hearing and then reconsideration, both of which are nonadjudicatory and are not designed to produce a record developed by formal, trial-type proceedings. Therefore, as noted, our review is to determine whether CHAMPUS's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).
 
 
 17
 In making this determination, the court reviews the administrative record as it stood when the agency acted, not extra-record material produced later in court. Florida Power & Light Co. v. Lorion, 470 U.S. 729, 743-44, 105 S.Ct. 1598, 1606-07, 84 L.Ed.2d 643 (1985); Camp v. Pitts, 411 U.S. at 142, 93 S.Ct. at 1244; Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. at 420, 91 S.Ct. at 825-26; National Med. Ent., Inc. v. Shalala, 43 F.3d 691, 695 (D.C.Cir.1995); Osaghae v. United States Immigration and Naturalization Serv., 942 F.2d 1160, 1162 (7th Cir.1991). "[W]e must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 2866-67, 77 L.Ed.2d 443 (1983) (quotations and citations omitted). Where Congress has authorized an agency to promulgate criteria for dispersing benefits and to interpret those criteria, a reviewing court must guard against substituting its own judgment for that of the agency. State Farm, 463 U.S. at 43, 103 S.Ct. at 2866-67; Overton Park, 401 U.S. at 416, 91 S.Ct. at 823-24. "[An] agency's interpretation [of its own regulations] must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, ----, 114 S.Ct. 2381, 2386, 129 L.Ed.2d 405 (1994) (internal quotation marks omitted); Hinsdale Hospital Corp. v. Shalala, 50 F.3d 1395, 1399 (7th Cir.1995) (deference particularly due when agency is interpreting regulations issued pursuant to complex scheme in which determinations necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns). Whether an agency decision violates the legal standards of § 706 or whether an agency interpretation of its regulations is plainly erroneous are questions of law. Our review of the district court's legal conclusions is therefore de novo. See 5 U.S.C. § 706; Director, O.W.C.P., United States Dept. of Labor v. Ball, 826 F.2d 603, 604 (7th Cir.1987) (interpreting statutory and regulatory language "a matter of law"; "For matters of law, the APA mandates de novo review."); see Durasys, Inc. v. Leyba, 992 F.2d 1465, 1470 (7th Cir.1993) (conclusions of law underlying permanent injunction reviewed de novo).
 
 B. Analysis
 
 18
 CHAMPUS's denial of coverage can be characterized either as an interpretation of its regulations governing experimental treatments, in which case we review for a "plainly erroneous or inconsistent" interpretation, Thomas Jefferson Univ., 512 U.S. at ----, 114 S.Ct. at 2386, or as a decision to adopt the view of one side of an ongoing debate in the medical community, in which case our review is under the arbitrary and capricious standard of 5 U.S.C. § 706(2)(A). Under either standard our review is highly deferential, monitoring only for glaring mistakes-obvious wrongness. Pozzie v. United States Dept. of Housing and Urban Development, 48 F.3d 1026, 1029 (7th Cir.1995) ("The 'arbitrary or capricious' standard of review is a deferential one which presumes that agency actions are valid as long as the decision is supported by a 'rational basis.' ") (emphasis added) citing Western & Southern Life Ins. Co. v. Smith, 859 F.2d 407, 410 (6th Cir.1988); Kisser v. Cisneros, 14 F.3d 615, 618 (D.C.Cir.1994) (review is "highly deferential"); and Hussion v. Madigan, 950 F.2d 1546, 1550 (11th Cir.1992).
 
 
 19
 The general exclusion of coverage for experimental or investigational procedures under CHAMPUS is contained in 32 C.F.R. § 199.4(g)(15):
 
 
 20
 (g) Exclusions and limitations. In addition to any definitions, requirements, conditions, or limitations enumerated and described in other sections of this part, the following specifically are excluded from the Basic Program:
 
 
 21
 ....
 
 
 22
 (15) [Treatments, etc.] [n]ot in accordance with accepted standards, experimental or investigational. Services and supplies not provided in accordance with accepted professional medical standards; or related to essentially experimental or investigational procedures or treatment regimens.
 
 
 23
 32 C.F.R. § 199.4(g)(15). The term "experimental" is defined as:
 
 
 24
 Medical care that essentially is investigatory or an unproven procedure or treatment regimen (usually performed under controlled medicolegal conditions) that does not meet the generally accepted standards of the usual professional medical practice in the general medical community.
 
 
 25
 32 C.F.R. § 199.2(b). The regulations do not set forth the criteria for determining whether a treatment or procedure meets "the generally accepted standards of the usual professional medical practice in the general medical community." CHAMPUS's Policy Manual defines "experimental" in essentially the same way as § 199.2; no additional standards are provided for ascertaining general acceptance. What qualifies, then, is a matter of agency interpretation subject to deferential court review.[7]
 
 
 26
 This is not the first time this court has addressed the ongoing dispute over the medical value of HDC/ASCR. In Harris v. Mutual of Omaha Cos., 992 F.2d 706, 712-13 (7th Cir.1993), we held that HDC/ABMT was "experimental" under the definition provided in the Rural Carrier Benefit Plan, a federal health insurance policy administered by the federal Office of Personnel Management. Our decision was at least partly based on a record containing eighteen articles and reports published between November 1986 and July 1992, each of which concluded that HDC/ABMT "is currently in the developmental stage and requires more clinical research before it can be considered standard treatment for breast cancer." Id. at 709. In Fuja v. Benefit Trust Life Ins. Co., we held that, although HDC/ABMT had "proven effective in treating certain cancerous blood diseases such as leukemia and Hodgkin's disease," as regards "solid-type tumors including breast cancer," 18 F.3d at 1407, "[t]he uncontradicted expert testimony and documentary evidence presented to the trial court establishes that HDC/ABMT is still of uncertain medical value and is presently being researched at a number of leading medical colleges and oncology research centers throughout the country." Id. at 1410. In Bechtold v. Physicians Health Plan, 19 F.3d 322 (7th Cir.1994), we similarly held that HDC/ABMT was not covered under an ERISA-governed insurance plan excluding "experimental or unproven procedures." Id. at 328. And most recently in Hooper v. Demco, Inc., 37 F.3d 287 (7th Cir.1994), we concluded that because payment for HDC/ABMT was not required under a health plan excluding "experimental" or "investigative" procedures, a patient was not entitled to recover attorneys' fees for the plan's refusal to extend coverage. Id. at 294-95.
 
 
 27
 These cases alone do not establish that HDC/ASCR was experimental at the time CHAMPUS denied Smith coverage.[8] The pace of medical science is ever quickening; yesterday's esoteric experiment is today's miraculous cure. But they do confirm that in the immediate past the medical efficacy of HDC/ASCR for the treatment of breast cancer was in dispute. That is noteworthy because at issue here is the point where a treatment which has been experimental in the past crosses the line into general acceptance--the point at which the medical value of a treatment is no longer generally disputed. Perhaps no such line exists; we are probably dealing more with a zone of perceived effectiveness than a precise dividing line. What is evident, though, and foremost in our minds as we consider this case, is the incompetence of courts to decide when exactly that line or zone has been traversed. Such decisions are judgment calls for medical scientists and health-care professionals, not judges. We are "not empowered to substitute [our] judgment for that of the agency." Overton Park, 401 U.S. at 416, 91 S.Ct. at 824. Which is why our standard of review in these cases is highly deferential. To repeat, our narrow duty is to monitor those charged with knowing and deciding these matters for decisions that are patently wrong; decisions we may fairly denounce as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Where the interpretation of a regulation is at issue, we guard against readings that are obviously incorrect. Thomas Jefferson Univ. v. Shalala, 512 U.S. at ----, 114 S.Ct. at 2386. Therefore, we cannot overturn CHAMPUS's decision to treat HDC/PSCR as still experimental if at the time it denied coverage there was a significant, on-going dispute in the medical community over HDC/PSCR's medical efficacy. Such a decision cannot be deemed arbitrary, for it entails the very judgment call Congress has assigned to the administrative agencies and not the courts. As the following reveals, the evidence before us clearly demonstrates such a dispute and therefore that CHAMPUS's determination must be upheld.
 
 
 28
 In an affidavit submitted to the district court, Dr. Bogner revealed the bases of CHAMPUS's decision to deny coverage:
 
 
 29
 6. The initial CHAMPUS policy regarding the investigational nature of HDC/ASCR in the treatment of breast carcinoma was based on four primary sources:
 
 
 30
 a. The American Medical Association Diagnostic and Therapeutic Technology Assessment (AMA DATTA) evaluation of January 1990 entitled "Autologous Bone Marrow Transplantation--Reassessment" by Elizabeth Brown, M.D....
 
 
 31
 b. The 1988 study entitled "Public Health Service Reassessment: Autologous Bone Marrow Transplantation" prepared by the Office of Health Technology Assessment, Agency for Health Care Policy and Research (OHTA/AHCPR) of the Public Health Service, and authored by Harry Handelsman, D.O....
 
 
 32
 c. The June 1993 study entitled "Autologous Bone Marrow Transplant and Peripheral Blood Stem Cell Rescue for the Treatment of Breast Cancer" copyright by ECRI[9] ....
 
 
 33
 d. News releases concerning the most recent ECRI assessment of "Autologous Bone Marrow Transplant and Peripheral Blood Stem Cell Rescue for the Treatment of Breast Cancer." This summary information was published in Health and Technology Trends in June 1994. I also received a copy of essentially the same material directly from ECRI on June 7, 1994....
 
 
 34
 Each of the studies Dr. Bogner referenced essentially treats HDC/ASCR as investigational or experimental in the treatment of breast cancer. For instance, the 1988 Public Health Service study authored by Dr. Handelsman states that "[t]he available evidence suggests that using ABMT for solid tumors [which include breast cancer], with the exception of neuroblastoma, has not shown meaningful increased survival times." The study noted conflicting views on the topic. For example, at the time of the study the National Cancer Institute-Navy Medical Oncology Branch had taken the position that "ABMT cannot be considered the standard of care other than in programs that are investigational," while the M.D. Anderson Hospital and Tumor Institute held that "ABMT should no longer be considered investigational since favorable results have been achieved in the treatment of lymphomas, neuroblastoma, and stage IV breast cancer." The study concluded that the effectiveness of ABMT was not certain and that "[i]n the absence of Phase III clinical trials directly comparing ABMT with conventional therapies in the treatment of most solid tumors and [given] the lack of other evidence convincing to the clinical community, its role continues to be undefined."
 
 
 35
 Six years later, HDC/ASCR remained controversial. An overview of the draft report for a 1994 study by ECRI, which Dr. Bogner relied on, opens by characterizing HDC/ASCR as an "experimental--and costly--treatment for advanced breast cancer [that] is diffusing into the health care system before there is any clear evidence that the treatment is better than conventional therapies." It states that after reviewing "over 300 published studies and articles," ECRI concluded that "results from the experimental procedure are not any better than published results for conventional therapy to treat advanced breast cancer." (Emphasis added.) ECRI Senior Research Analyst Dr. Nelson Erlick, author of the report, advised that "[i]f a hospital wants to provide high-dose chemotherapy and stem cell rescue to breast cancer patients, it should be aware that the impetus for this is more political than scientific," and that it is a "treatment that's becoming mandated by popular opinion." The summary also noted that "the design of some studies [of HDC/ASCR] is biased toward favorable results."
 
 
 36
 Though somewhat more reserved in tone, the full ECRI report, contained in the record before us, is no more supportive of HDC/ASCR. The summary of its clinical findings with respect to metastatic (stage IV) patients states that "[t]here is no evidence that HDC/ABMT or HDC/ ASCR,[10] when taken as groups, provide longer survival times than conventional therapy."[11] To the contrary, "[m]ost HDC with stem cell rescue regimens are associated with shorter survival times compared to the conventional regimens." (Emphasis in original.) The final paragraph of this section concludes:
 
 
 37
 Current data suggest that existing HDC with ASCR regimens are unlikely to produce significantly greater response durations and survival times than conventional therapy. These data also suggest that it is unlikely that controlled trials (in progress) will demonstrate any substantive improvement in the quality of life or survival times for metastatic patients. It is possible that investigators may identify effective regimens and/or determine prognostic factors to identify metastatic breast cancer patient subsets most likely to experience sustained, complete responses and increased survival times. Unfortunately, based on available studies, this seems improbable.[12]
 
 
 38
 Smith challenges the relevance of these conclusions because they apply to metastatic, i.e., stage IV, breast cancer and not to the milder stage III cancer that afflicts her. Smith has been described as having "advanced" breast cancer and as a "poor prognosis" patient with a "metastatic tumor" present in both her breast and lymph nodes and "an extremely high risk to develop recurrent disease." CHAMPUS maintains that the ECRI report's findings are therefore directly relevant. But whichever side is correct, the ECRI report also indicates that the effectiveness of the procedure for treating stage III breast cancer remains uncertain: "There are insufficient data at this time for assessing the effectiveness of HDC with ASCR for inflammatory, stage III, or stage II ... breast cancer patients. Controlled studies are in progress."
 
 
 39
 Another report, also referenced in Dr. Bogner's affidavit, similarly supports CHAMPUS's decision. The January 1994 edition of the Journal of Clinical Oncology reported on an international conference on HDC with stem cell support. The report states that while "there is ample scientific background for vigorous clinical investigation in this important area," there is "currently insufficient evidence to justify the use of HDC plus HSC [hematopoietic stem cell] transplantation outside the setting of a clinical trial for any stage of breast cancer."
 
 
 40
 These studies are powerful evidence that HDC/ASCR remains experimental. As noted, when invited to submit countervailing evidence Smith supplied affidavits from three oncologists connected with her case, references to several district court decisions on the matter, and an article suggesting that insurance coverage is usually approved for HDC/PSCR. No refereed journal articles or other technical data reviewing the present state of medical opinion concerning HDC with stem cell recovery regimes was submitted.
 
 
 41
 We do not mean to disparage the opinions of Smith's able physicians. Barely familiar with the vocabulary, it is fortunately not our duty to decide which medical view is correct. The function assigned to us by Congress in these matters is simply to guard against arbitrary decisions and plainly erroneous interpretations. Whatever our sympathies, beyond that we cannot go. Given the considerable evidence indicating that HDC, whether accompanied by ABMT or PSCR, remains controversial for the treatment for breast cancer, we cannot say CHAMPUS's decision to deny Smith coverage for HDC/ PSCR was arbitrary and capricious or a plainly erroneous interpretation of its regulations. Widespread disagreement among qualified medical experts over a medical issue virtually precludes a reviewing court from concluding that an agency decision that agrees with one side is arbitrary or plainly wrong, even if the court finds other views more persuasive. See, e.g., Florida Manufactured Housing Ass'n, Inc. v. Cisneros, 53 F.3d 1565, 1572 (11th Cir.1995) (remarking that in the context of rulemaking, "[w]hen the agency is confronted with opposing views among specialists, it must be given the discretion to rely on the reasonable opinions of its own experts, even if a court finds other views more persuasive"); Franklin Sav. Ass'n v. Director, Office of Thrift Supervision, 934 F.2d 1127, 1144 (10th Cir.1991), cert. denied, 503 U.S. 937, 112 S.Ct. 1475, 117 L.Ed.2d 619 (1992) (observing in the context of reviewing agency action that "[c]onflicting expert opinion ... is not sufficient to allow a reviewing court to conclude the agency decision was arbitrary, capricious or an abuse of discretion"). We are therefore legally compelled to uphold CHAMPUS's decision.
 
 
 42
 In so doing, we reject Smith's allegation, accepted by the district court, that CHAMPUS has arbitrarily equated general acceptance with completed Phase III trials. The Fourth Circuit in Wilson v. CHAMPUS, 65 F.3d 361 (4th Cir.1995), which was decided after the district court's decision in this case, also concluded that CHAMPUS had imposed a rigid requirement--"an unwritten agency policy"--mandating Phase III trials before a treatment can be provided. Id. at 365-66. Whatever the evidence before the court in Wilson, on the record before us, Smith and the district court have misconstrued CHAMPUS's position. The record does not indicate that CHAMPUS has created a broad new requirement, much less "an unwritten agency policy," that every new procedure successfully complete Phase III trials before being approved. Rather, CHAMPUS has determined that given the on-going controversy and absent convincing new evidence, Phase III trials will be necessary to determine whether HDC/ASCR can fairly be said to have moved beyond the experimental to the generally accepted.
 
 
 43
 Our colleague disagrees. He argues that Dr. Bogner's letter of response to the "new information" submitted by Smith's doctors "indicated that published Phase III trials are a sine qua non for coverage." Post at 964. For support the dissent quotes the letter's statement that "CHAMPUS bases its policies upon outcomes of Phase III clinical trials as published in the refereed medical literature." The dissent treats this as nearly conclusive evidence that CHAMPUS has "created a requirement that every new procedure successfully complete Phase III trials before being approved." Id. at 964 (emphasis added).
 
 
 44
 The record does not support such a sweeping interpretation. Like all documents, Dr. Bogner's letter must be read in the context in which it was written: as an explanation for why CHAMPUS decided to maintain its initial determination that HDC/ASCR is an experimental treatment for breast cancer--not as a comprehensive statement of CHAMPUS's approach to all new procedures and treatments. The affidavit of Martha Maxey, CHAMPUS's Health Benefits Program Analyst, (parts of which the dissent quotes, post at 962) confirms this reading: "In determining whether a procedure is investigational, the Office of CHAMPUS looks to national medical policy organizations [i.e., not solely to completed Phase III trials] to ascertain that adequate evidence exists to establish a procedure or treatment as safe, effective and generally acceptable medical practice. The information provided by these national technology assessing agencies, such as the Office of Health Technology Assessment of the Agency for Health Care Policy and Research of the Public Health Service, generally provides direction as to the final structure of the CHAMPUS benefit policy." "Each report" from these organizations, the affidavit continues, "represents a detailed analysis of the safety, clinical effectiveness and use of new or unestablished medical technologies." As related above, in 1988 a study of HDC/ABMT by OHTA concluded that the role for the procedure in treating solid tumors, like breast cancer, "continues to be undefined." See ante at 957. Maxey's affidavit states that in light of this and other more recent reports, which now include the 1993 and 1994 ECRI reports, "CHAMPUS has concluded that the clinical trials published to date have not provided definitive evidence of the benefit of ABMT for the treatment of solid tumors other than neuroblastoma." These "clinical trials published to date" necessarily were non-Phase III trials, since thus far no Phase III trials have been completed. Dr. Bogner's affidavit discussing the basis for CHAMPUS's initial determination that HDC/ASCR is experimental confirms this. See ante at 957-58. It is in this specific context--and not because of an arbitrarily imposed general requirement--that CHAMPUS has determined that Phase III trials are necessary, as the next sentence of the affidavit shows: "Therefore, in the absence of Phase III clinical trials directly comparing ABMT with conventional therapies in the treatment of most solid tumors (including breast cancer) and the lack of other evidence convincing to the medical community, CHAMPUS considers its role to be undefined." (Emphasis added.) Given this, and other similar evidence in the record,[13] we cannot agree with the dissent that CHAMPUS has adopted a mindless "Phase III or nothing" approach to all new treatments, nor that there is any reasonable factual dispute in this regard. Cf. post at 966-67.
 
 
 45
 To the contrary, Smith's doctors were explicitly invited to "submit pertinent documentation to support" their view of the efficacy and general acceptance of HDC/PSCR. We assume that had they produced such evidence coverage would have been granted. Taken in context, Dr. Bogner's cautionary statements about the importance of Phase III studies merely indicate that while the medical controversy over the efficacy of HDC/ASCR rages, CHAMPUS will sit tight until convincing evidence is forthcoming.[14]
 
 
 46
 In this regard, it is important to realize that we are not dealing with the introduction of, say, penicillin, where the treatment's immediate and obvious success might obviate the need for further studies before it can be deemed generally accepted. Wilson noted the possibility of a treatment becoming generally accepted without Phase III trials and then, after referencing a letter from a number of physicians supporting HDC/PSCR, implied that HDC/PSCR must be such a treatment. Id. at 365-66. We assume from its ready acceptance of an informal testimonial that the Fourth Circuit did not have before it the technical studies we reviewed above. To summarize, these studies demonstrate, as does this entire controversy, that the medical value of HDC/ASCR--whether with ABMT or PSCR--is hotly disputed among medical professionals. In the context of such a dispute-which, we again emphasize, we are institutionally and professionally incompetent to resolve-CHAMPUS's decision to await the results of Phase III trials or other persuasive proof before determining that the taxpayer must fund this procedure was not a "plainly erroneous" interpretation of its regulations or otherwise an abuse of its discretion.
 
 
 47
 Furthermore, even if CHAMPUS had set the hurdle too high by equating general acceptance with completed Phase III trials, that alone does not establish that HDC/PSCR is generally accepted and thus covered by CHAMPUS. Striking a standard as too high does not make everything rejected under that standard automatically acceptable. We are still left with the fact that on the record before us there is no convincing evidence that HDC/PSCR has moved beyond the experimental stage to general medical acceptance--and most certainly none that would allow us to condemn CHAMPUS's decision as plainly erroneous or arbitrary and capricious. Like everyone concerned with the fate of breast cancer patients, we sincerely hope HDC/ASCR proves the cure so many desperately seek. But we cannot substitute our hopes for CHAMPUS's considered judgment.
 
 III.
 
 48
 The judgment of the district court is REVERSED. We REMAND to the district court to enter an appropriate order affirming CHAMPUS's initial determination denying Smith coverage.
 
 
 49
 ESCHBACH, Circuit Judge, dissenting.
 
 
 50
 The majority informs us that Erin Smith has received the HDC/ASCR and the majority is "pleased to report that she is alive and no longer undergoing treatment." Ante at 954 n. 5. The majority then goes on to hold that CHAMPUS properly interpreted its regulations and that CHAMPUS properly found that HDC/ASCR does not meet "the generally accepted standards of the usual professional medical practice in the general medical community." 32 C.F.R. § 199.2(b). This decision places this court squarely in conflict with the Fourth Circuit. The result of the decision is a lack of national uniformity--CHAMPUS, a national health benefits program that provides medical benefits for dependents of active-duty and retired members of the United States Military, must cover HDC/ ASCR treatment in one part of the country but is free to refuse to cover the treatment in another part of the country. This decision has broader, though no less significant, ramifications because it has implications for coverage decisions regarding other innovative treatments. For the following reasons, I respectfully dissent.
 
 I.
 
 51
 CHAMPUS's regulations provided that it would pay for medically necessary services, subject to the limitations and exclusions specified in the regulations. 32 C.F.R. § 199.4(a)(1). The regulations listed seventy-four separate exclusions and limitations, but the regulations did not exclude high dose chemotherapy with peripheral stem cell rescue. See 32 C.F.R. § 199.4(g). The regulations did contain an exclusion of coverage for experimental or investigational procedures. 32 C.F.R. § 199.4(g)(15). The term "experimental" is defined in the regulations as:
 
 
 52
 Medical care that essentially is investigatory or an unproven procedure or treatment regimen (usually performed under controlled medicolegal conditions) that does not meet the generally accepted standards of the usual professional medical practice in the general medical community.
 
 
 53
 32 C.F.R. § 199.2. This case turns on CHAMPUS's interpretations of its own regulations. We give substantial deference to an agency's interpretation of its own regulations and "the agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." Thomas Jefferson University v. Shalala, 512 U.S. 504, ----, 114 S.Ct. 2381, 2386, 129 L.Ed.2d 405 (1994) (internal quotation marks omitted).
 
 
 54
 CHAMPUS must determine whether a procedure is "experimental" by looking to the "generally accepted standards" of the "general medical community." Essentially, the definition of "experimental" requires CHAMPUS to look outside the agency itself, CHAMPUS must look to the general medical community for guidance. CHAMPUS did not do this. CHAMPUS interpreted its regulations as requiring publicized results of Phase III clinical trials in order to establish that a particular treatment was not experimental. This interpretation is inconsistent with CHAMPUS's own regulation and CHAMPUS's decision to deny coverage based on its interpretation of its regulations was arbitrary and capricious.
 
 
 55
 Requiring publicized results of Phase III clinical trials to establish that a procedure is not "experimental" is inconsistent with CHAMPUS's own regulations, which require only that the procedure meet the generally accepted standards of the general medical community. Medical treatments may become generally accepted without first passing Phase III clinical trials. For example, the Fourth Circuit noted that home run treatments are those treatments that "prove themselves so significantly that Phase III trials are not necessary." Wilson v. CHAMPUS, 65 F.3d 361, 365 (4th Cir.1995). As the Fourth Circuit points out, a therapy may become standard practice in the medical community before it has been proven more effective than traditional treatments through Phase III studies. Id. (citing Pirozzi v. Blue Cross-Blue Shield, 741 F.Supp. 586, 593 (E.D.Va.1990) ("Many treatments become accepted without phase III studies....")). The record in the instant appeal contains similar evidence. Martha Maxey, CHAMPUS's Health Benefits Program Analyst, stated in her affidavit that clinical trials are not completed if a particular treatment essentially hits a home run. Appellant's Appendix at 37 ("To resolve the void in published outcome-based research, the National Cancer Institute (NCI) in 1991 approved four multicenter randomized trials to evaluate high dose chemotherapy with ABMT for the treatment of breast cancer. It was anticipated that these studies would be completed within three to five years. However, these studies are structured such that if sufficient evidence becomes available during the trial that a treatment is clearly superior, the trial is to be ended.").
 
 
 56
 CHAMPUS's interpretation of its regulations is inconsistent with the regulations because requiring Phase III trials creates an artificial standard that is not contained in the regulations, and is a higher standard than the regulations provide. Phase III trials involve testing a procedure on a control group in which some patients receive the treatment at issue and some patients do not receive the treatment. The purpose of Phase III trials is to compare the effectiveness of a new treatment to the effectiveness of existing treatments. Yet, before Phase III trials are conducted, the procedure already must have proven to be effective in treating the disease through successful completion of Phase II trials.
 
 
 57
 Phase II establishes the procedure's effectiveness in treating a disease. Phase III determines whether the procedure is the most effective method of treating a disease. The regulations do not require that the treatment be the most effective treatment.[1] The regulations do not even require that the treatment be "scientifically" proven to be effective. In the case of a patient dying from breast cancer, HDC/ASCR is often a treatment of last resort. If the most effective treatment has been tried and failed, then a less effective procedure may be used as a last ditch effort to save human life, as long as the treatment is generally accepted in the general medical community. The Fourth Circuit's opinion summarizes the issue well:
 
 
 58
 CHAMPUS relied on an unwritten agency policy mandating Phase III trials before a treatment is provided. In contrast, federal regulations require only that a therapy be generally accepted, see [32 C.F.R.] § 199.2(b), not that it prospectively be proven to have a statistically significant effect in curing a disease. While the two categories overlap to a substantial degree, they are not co-extensive, and CHAMPUS wrongly ignored the distinction between them. Effectively, CHAMPUS imposed a requirement beyond those in the applicable regulations by creating an informal, but nonetheless binding, prerequisite that a treatment pass Phase III trials.
 
 
 59
 Id. at 366. Because the CFR definition requires CHAMPUS to look to the generally accepted standards of the medical community, CHAMPUS cannot make it a sine qua non that a treatment has passed Phase III trials before it is considered non-experimental.
 
 II.
 
 60
 CHAMPUS's interpretation of its own regulations as requiring published results of Phase III clinical trials in order to establish that HDC/ASCR is not experimental is inconsistent with the regulation itself. The majority does not disagree with this conclusion directly. The majority finds that CHAMPUS did not require published Phase III trials.
 
 
 61
 The record does not indicate that CHAMPUS has created a broad new requirement, much less "an unwritten agency policy," that every new procedure successfully complete Phase III trials before being approved. Rather, CHAMPUS has determined that given the on-going controversy and absent convincing new evidence, Phase III trials will be necessary to determine whether HDC/ASCR can fairly be said to have moved beyond the experimental to the generally accepted.
 
 
 62
 Ante at 959. I cannot agree with the majority's new finding. First, it contradicts the record. Second, it contradicts the admissions made by CHAMPUS to the court. Third, it contradicts the understanding of the matter expressed by this court in its earlier (now vacated) opinion. Fourth, it creates a genuine issue of material fact.
 
 
 63
 A. The Record In This Case.
 
 
 64
 The record makes clear that Dr. Bogner interpreted the regulations as requiring the completion of Phase III clinical research trials demonstrating the effectiveness of HDC/ASCR treatment as compared to conventional breast cancer therapy. In his initial letter denying coverage, Dr. Bogner stated:
 
 
 65
 CHAMPUS is allowed to consider coverage for those forms of therapy that are not experimental or investigational. CHAMPUS continuously reviews the current literature for outcomes of Phase III trials regarding [HDC/ASCR]. In the case of breast carcinoma, we have been unable to find sufficient evidence of this nature to date. In the absence of published randomized, prospective trials, CHAMPUS must continue to consider this therapy as investigational for the treatment of breast carcinoma.
 
 
 66
 ....
 
 
 67
 If you disagree with this CHAMPUS benefit determination, we invite you to submit pertinent documentation to support the position that [HDC/ASCR] treatment of breast carcinoma does, in fact, meet the generally accepted standards of usual professional medical practice in the general medical community. While personal opinions are valued, we must give the greatest weight to well-designed, Phase III, outcome based studies which have been published in refereed medical journals.
 
 
 68
 Bogner Letter of August 2, 1994, at 1-2 (emphasis added). The majority posits that Dr. Bogner's invitation to submit pertinent documentation and his statement that "personal opinions are valued" but Phase III studies are given the "greatest weight" "does not indicate that CHAMPUS has created a broad new requirement, much less 'an unwritten agency policy,' that every new procedure successfully complete Phase III trials before being approved." Ante at 959.
 
 
 69
 The majority's position is contradicted by the record. Smith did submit new materials in response to Dr. Bogner's invitation, including: (1) the affidavits of three oncologists stating that HDC/ASCR is not new, investigational, or experimental and is a generally accepted treatment that is considered standard care by oncologists; (2) several Federal District Court rulings that CHAMPUS's decision to deny coverage for HDC/ASCR was arbitrary and capricious; and, (3) a study published in the New England Journal of Medicine that indicated that the majority of requests to insurance companies for coverage of high-dose chemotherapy are granted. Dr. Bogner's response to this new information indicated that published Phase III trials are a sine qua non for coverage.
 
 
 70
 As discussed in our 2 August 1994 benefit interpretation letter, CHAMPUS bases its policies upon outcomes of Phase III clinical trials as published in the refereed medical literature. You assert that CHAMPUS has no requirement in statute or regulation for this standard.... The APA does not require that CHAMPUS publish the internal process by which such coverage determinations are made. Further, we believe that our reliance upon the unbiased reporting of these Phase III studies in the refereed medical literature provides the most objective basis upon which we can build new coverage benefits. Consequently, CHAMPUS has chosen to continue the use of this Phase III clinical trial standard, in spite of the injunctive relief decisions provided at the federal district court level.
 
 
 71
 ....
 
 
 72
 If CHAMPUS is to adopt a benefit for HDC/ASCR in the treatment of breast carcinoma, it will do so based upon outcomes of Phase III clinical trials as published in the refereed medical literature, or upon formal technology assessments which cite Phase III outcomes as their recommended basis.
 
 
 73
 Bogner Letter of September 14, 1994, at 1-2 (emphases added). Clearly, CHAMPUS's use of a "Phase III clinical trial standard" created a requirement that every new procedure successfully complete Phase III trials before being approved. Dr. Bogner's reference to the internal process by which such coverage determinations were made is a reference to "an unwritten agency policy." The majority's analysis ignores the facts of the case.
 
 
 74
 Dr. Bogner's statements are confirmed by CHAMPUS's Health Care Program Analyst, Martha Maxey.
 
 
 75
 Although [HDC/ASCR] for breast cancer has gained acceptance among many oncologists, CHAMPUS has not found that the advantages over conventional therapy have been scientifically established. Our coverage position is based upon the fact that neither technology assessments, scientifically controlled studies, or current medical literature have yet shown that [HDC/ASCR] for the treatment of breast cancer is safe, effective and superior to existing therapies. In order for CHAMPUS to adopt a new benefit, these elements must be demonstrated.
 
 
 76
 Affidavit of Martha M. Maxey, at 4 (emphasis added). Maxey's statements indicate that CHAMPUS rejected the acceptance of HDC/ASCR among many oncologists (which sounds a lot like it meets the "general accepted standards" of the "general medical community") because HDC/ASCR's "advantages over conventional therapy have not been scientifically established."[2] These "elements" lack a statutory or regulatory basis and go beyond establishing that a treatment is generally accepted in the general medical community. These "elements" are, however, consistent with CHAMPUS's requirement that new procedures complete Phase III trials before being approved. See ante at 953 n. 3 (noting that Phase III trials "assess the efficacy of the experimental treatment as compared with conventional treatments").
 
 
 77
 B. CHAMPUS Admitted That It Required PHASE III Trials.
 
 
 78
 The majority's finding that CHAMPUS does not require published Phase III trials is contradicted by CHAMPUS's own statements. In its brief in opposition to petition for rehearing, CHAMPUS states: "CHAMPUS Medical Director, Dr. David Bogner, denied plaintiff's request for [HDC/ASCR] coverage on the basis that no published, randomized, Phase III clinical trials have demonstrated the medical acceptance of [HDC/ASCR]." CHAMPUS's Opposition To Petition for Rehearing With Suggestion for Rehearing En Banc, at 3. If there is any ambiguity regarding whether this is Champus's interpretation of the regulations at issue, CHAMPUS clears up the ambiguity. "CHAMPUS Medical Director, Dr. Bogner, has interpreted [32 C.F.R. §§ 199.2(b) and 199.4(g)(15) ] in this context as requiring the completion of Phase III clinical research trials demonstrating the effectiveness of [HDC/ASCR] treatment as compared to conventional breast cancer therapy, in order to provide an 'unbiased' and 'objective' standard to evaluate this new procedure." Id. at 6; see also id. at 9 ("CHAMPUS ultimately chose the Phase III standard because the unbiased reporting of these Phase III studies in the refereed medical literature provides the most objective basis upon which we can build new coverage benefits.").
 
 
 79
 In its brief on rehearing, CHAMPUS has changed its tack slightly. CHAMPUS now proposes that it required that HDC/ASCR be "safe, effective, and superior to existing therapies." This new "standard" is problematic for two reasons. First, a requirement that a new procedure be "superior to existing therapies" is without statutory or regulatory basis and goes beyond the pale of general acceptance in the general medical community. Second, this new "standard" is simply a derivative of CHAMPUS's still existing litmus test that a new treatment must have passed Phase III trials.
 
 
 80
 CHAMPUS' requirement that HDC/PSCR be "safe, effective and superior to existing therapies" derives directly from the nature of scientific research on the new therapies for cancer treatment. As Dr. Bogner explained, before a new cancer therapy can be scientifically accepted, it must be evaluated in Phase I, Phase II and Phase III clinical trials. If a new therapy has been proven in Phase III clinical trials, its safety, efficacy and superiority to existing treatments has been scientifically established. Further, because these requirements are inherent in the nature of scientific research on new cancer therapies, CHAMPUS has chosen to adopt them in evaluating whether HDC/PSCR meets "generally accepted standards" and, therefore, cannot be viewed as "investigational" or "experimental" within its regulations.
 
 
 81
 Appellant's Brief at 30 (internal citations omitted).
 
 
 82
 C. The Majority's Position.
 
 
 83
 The majority's "finding" that CHAMPUS did not require that every new procedure successfully complete Phase III trials before being approved is surprising given this court's earlier opinion. In that opinion, the court stated:
 
 
 84
 There appear to be two issues in this case. The first is whether CHAMPUS properly interpreted its regulations as requiring publicized results of Phase III clinical trials in order to determine whether HDC/ PSCR for the treatment of breast cancer met "accepted professional medical standards," and thus was no longer "experimental" under the CHAMPUS regulations. If so, then the second issue is simply whether, employing that interpretation, CHAMPUS' decision to deny benefits for Smith's breast cancer treatment was arbitrary and capricious.
 
 
 85
 Smith v. CHAMPUS, 66 F.3d 905 (7th Cir.1995), rehearing granted and opinion vacated (Dec. 15, 1995). The court answered these questions: yes and no. Whether CHAMPUS had a policy that required Phase III trials was never an issue. The court acknowledged that CHAMPUS had such a policy and the issue was whether CHAMPUS's policy was a proper interpretation of the regulations. With respect to the first issue, whether CHAMPUS properly interpreted its regulations as requiring publicized results of Phase III clinical trials, we stated:
 
 
 86
 CHAMPUS could have provided that whether a procedure is experimental is to be decided on a case-by-case basis, following the agency's review of expert testimony on one side claiming that it is, and the other side's equally qualified expert testimony claiming it isn't. But CHAMPUS did not adopt such an interpretation. Instead, CHAMPUS decided that the proper criteria for making this determination should be the publicized results of Phase III trials. This interpretation of the regulation sets forth an objective and efficient method of making the required determination. We find nothing erroneous in this interpretation, nor do we find it inconsistent with the regulation.
 
 
 87
 Id. (emphasis added). Today, the majority bases its holding on its new finding that CHAMPUS never had a policy in the first place. I cannot accept this. The facts, CHAMPUS's admissions, and this court's prior statements on the issue indicate that Champus did have such a policy. We must address whether such a policy was consistent with CHAMPUS's own regulations. It was not, and CHAMPUS's decision to deny coverage based on its interpretation of its regulations was arbitrary and capricious.
 
 
 88
 D. Genuine Issue of Material Fact.
 
 
 89
 Even assuming that the majority appropriately rejects the weight of the evidence and determines that the record in this case does not conclusively establish that CHAMPUS had a policy that required new procedures to have completed Phase III trials, the majority is simply creating a genuine issue of material fact. It cannot be that CHAMPUS both had a policy that mandated Phase III trials before a treatment is provided and did not have a policy that every new procedure successfully complete Phase III trials before being approved. Cf. Wilson, 65 F.3d at 366 (CHAMPUS had such a policy) with ante at 959-60 (CHAMPUS does not have such a policy).
 
 
 90
 If this issue is a question of fact susceptible to proof in the normal ways, then clearly Smith has produced enough evidence to defeat summary judgment against her. In such a case, it is improper for this court to remand to the district court to enter an order affirming CHAMPUS's initial determination denying Smith coverage. At most, this court should remand to the district court for a determination of whether CHAMPUS had such a policy. If this issue is a question of law, then we have created a conflict with the Fourth Circuit's decision in Wilson and the Fourth Circuit has it right. CHAMPUS's policy required publicized results of Phase III clinical trials in order to establish that a particular treatment was not experimental.
 
 III.
 
 91
 The record in this case requires us to affirm the lower court's decision. CHAMPUS admits that its initial decision to classify HDC/ASCR as investigational "was based on literature and technical assessments dating from the 1988-1990 time-frame...." Affidavit of Dr. David Bogner, at para. 7. The district court appropriately found that it was improper for CHAMPUS to rely on outdated studies in the face of the affidavit testimony presented by plaintiff's oncologist experts. The oncologists' curricula vitae indicate that their medical expertise is national. Their affidavits indicated that HDC/ASCR is generally accepted in the general medical community. The affidavits were sworn in late August and early September of 1994. In addition, experts in other areas of the country had reached similar conclusions, see Gripkey v. Mail Handlers Benefit Plan, No. 3:94-378-0, 1994 WL 276265 (D.S.C. Feb 14, 1994) (unpublished); Hawkins v. Mail Handlers Benefit Plan, No. 1:94 CV 6, 1994 WL 214262 (W.D.N.C. Jan.28, 1994) (unpublished) and Wheeler v. Dynamic Engineering, Inc., 850 F.Supp. 459 (E.D.Va.1994), aff'd, 62 F.3d 634 (4th Cir.1995), and CHAMPUS had received notice of the expert opinions in these cases.
 
 
 92
 The majority recognizes that the status of certain medical treatments is in a state of flux and notes that the medical value of HDC/ASCR is an "ongoing dispute." Ante at 956; see also id. at 956 ("The pace of medical science is ever quickening; yesterday's esoteric experiment is today's miraculous cure."). In this "ongoing dispute," the record supports the plaintiff's position that HDC/ASCR is not experimental. The majority, however, seeks to rely on a July 1993 study entitled "Autologous Bone Marrow Transplant and Peripheral Blood Stem Cell Rescue for the Treatment of Breast Cancer" (the "ECRI study") and news releases published in Health and Technology Trends in June 1994 (the "HTT news release"). Reliance on these sources is misplaced. First, CHAMPUS simply reviewed these more recent studies to determine whether HDC/ASCR had passed published Phase III clinical trials. Second, a review of these sources indicates that neither source concludes that HDC/ASCR is not generally accepted in the general medical community.
 
 
 93
 As the majority notes, the ECRI study, addressed metastatic (stage IV) therapies rather than the milder stage III cancer that afflicts plaintiff Smith. In addition the ECRI study, which was over fifteen months older than the affidavits of the three oncologists, noted that HDC with ABMT was not an entirely "experimental" treatment, even at the time of the report. "Although still considered experimental for breast cancer, it is approved for acute leukemia in remission, resistant non-Hodgkins disease, recurrent neuroblastoma, and advanced Hodgkin's disease if conventional therapy has failed." Id. § 2.4. Clearly the treatment is considered safe and useful for treatment of other conditions. Thus, it is not clear that the report lends any support to CHAMPUS's position that HDC/ASCR is experimental for Smith's stage III cancer.
 
 
 94
 Furthermore, a review of the report lends support to Smith's position. The report noted that a number of Phase III studies were in progress at the time the report was completed:
 
 
 95
 At present, there are three Phase III and five Phase II protocols examining HDC with ABMT or PBSCR. Phase III protocols include randomized studies comparing conventional chemotherapies using HDC with stem cell rescue for metastatic and high-risk (stages II and IIIA) breast cancer. Phase II studies include induction using HDC with PBSCR....
 
 
 96
 ECRI Report at § 2.4. Phase III trials would not be necessary if HDC/ASCR showed no promise. The remainder of the report indicates that HDC/ASCR did show promise.
 
 
 97
 The report noted that Phase I and some Phase II studies had been completed. Id. § 2.11. On the basis of these studies, the ECRI report concluded that there was a statistical improvement in patients who received HDC with ABMT.Combination-agent HDC with ABMT has replaced single agent treatment. Overall, in 486 patients, the CRR [Complete Response Rate] was 38%, with the ORR [Objective Response Rate] at 68%. There is a statistical improvement in the CRR and ORR, and the median duration times of combination-agent HDC with ABMT compared to STD combination agents.
 
 
 98
 Id. at § 4.1.1.4; see also id. at § 8.0 (the Report's General Summary concludes that "For metastatic breast cancer, ... [c]ombination-agent HDC with ABMT appears to statistically improve the response and duration times over standard combinations and has replaced single-agent HDC with ABMT therapy."). This statistical improvement translates into quantifiable benefits.[3]
 
 
 99
 After five years, 12.9% of HDC with ABMT cases are in complete remission (death rate = 84.2%) compared to 2.5% (death rate = 95.7%) for STD. Statistically, one year after initial therapy, 75 out of every 100 lives are saved by HDC with ABMT as opposed to 63.1 by STD. Both survival rates drop rapidly after three years (HDC with ABMT = 26.6%; STD = 14.0% and five years (HDC with ABMT = 15.8%; STD = 4.3%). In total, HDC with ABMT statistically saves 233.8 years of life (75 lives for one year plus 26.6 for three years plus 15.8 for five years), while STD saves 126.6 years of life (63.1 lives for one year plus 14.0 for three years plus 4.3 for five years).
 
 
 100
 Id. at § 5.1.[4] I do not find it unusual for the general medical community to accept a treatment that improves the odds that patients will survive longer and go into complete remission, especially when the treatment has already been accepted by the general medical community as safe and useful for the treatment of similar conditions.
 
 
 101
 The HTT news release describes HDC/ASCR as "[a]n experimental--and costly--treatment for advanced breast cancer [that] is diffusing into the healthcare system before there is any clear evidence that the treatment is better than conventional therapies." HTT News Releases. The report does not say that HDC/ASCR is not effective in treating breast cancer. It says that it is not clear that it is more effective than conventional therapies. So what. CHAMPUS's regulations say nothing about requiring a particular treatment to be statistically proven in published results to be the most effective treatment. The regulations require the treatment to be generally accepted in the general medical community. On this note, the HTT news release relates that HDC with peripheral stem cell rescue is becoming a common procedure.
 
 
 102
 The number of stem cell rescue procedures performed worldwide is increasing. By 1992, some 19,000 transplants had been performed, up from over 2,500 performed as of 1986. And the total number of transplants is expected to reach 251,000 by 1998....
 
 
 103
 Id. The HTT news release certainly makes HDC/ASCR seem like a procedure that has been generally accepted in the general medical community. The authors of the HTT news release simply object to the fact that HDC/ ASCR is expensive and the fact that acceptance of HDC/ ASCR has preceded the publication of Phase III clinical trials.
 
 IV.
 
 104
 CHAMPUS interpreted its own regulations as requiring plaintiff Smith to produce published results of Phase III clinical trials in order to establish that the treatment she needed was not experimental. CHAMPUS's interpretation is inconsistent with the regulation, which requires that the treatment "meet the generally accepted standards of the usual professional medical practice in the general medical community." 32 C.F.R. § 199.2. CHAMPUS's decision to deny coverage based on its interpretation of the regulations was therefore arbitrary and capricious. Plaintiff Smith presented sufficient evidence to establish that HDC/ASCR was not experimental. CHAMPUS's evidence, which was all of less recent vintage than plaintiff's evidence, simply pointed out that there were no published results of Phase III clinical trials and pointed out the redundancy that it had not been "scientifically established" that HDC/ASCR was more effective than conventional therapy. CHAMPUS's evidence did not contradict plaintiff's evidence and in fact supported plaintiff's position to some degree by noting that HDC/ASCR is at least as effective as conventional therapy. I respectfully dissent.
 
 
 
 [1]
 The court released its original decision in this case in slip opinion form on September 26, 1995. On December 15, 1995, the panel vacated its original opinion and granted the plaintiff's petition for rehearing pursuant to Fed. R.App. P. 40. Because the holding of this case is in conflict with Wilson v. CHAMPUS, 65 F.3d 361 (4th Cir.1995), it has been circulated to the full court in accordance with Seventh Circuit Rule 40(e). A majority of judges in active service voted not to rehear the case en banc. Judges Ripple, Kanne, Rovner, D. Wood, and Evans voted to grant rehearing en banc
 
 
 [2]
 Compare Mattive v. Healthsource of Savannah, 893 F.Supp. 1559, 1572 (S.D.Ga.1995) ("The Court recognizes that the ABMT and the PSCR accomplish the same thing when used in conjunction with HDC in treating cancer patients .... but the procedures for removing the stem cells are different.... Assuming that the HDC with ABMT would be excluded by [the policy language], the Court agrees with Defendant that the failure to exclude HDC with PSCR under this provision would indeed be a failure to exclude based on semantics."), with Wheeler v. Dynamic Engineering, Inc., 850 F.Supp. 459, 468 (E.D.Va.1994) ("Although the two procedures are similar in that they both provide support for a patient receiving high dose chemotherapy, the two are distinct procedures."), and Bishop v. CHAMPUS, 917 F.Supp. 1469, 1472 n. 1 (E.D.Wash.1996) (although PSCR and ABMT are both support treatments for HDC and not the principal components of HDC, "[t]he Court questions whether the CHAMPUS policy of equating PSCR and ABMT would survive judicial review, even under the deferential standard imposed by the APA.")
 At the time Smith submitted her request, CHAMPUS authorized ABMT to support HDC therapy for the treatment of non-Hodgkin's lymphoma (intermediate or high grade stage III or stage IV); Hodgkin's disease (stage III or stage IV A or B) when standard chemotherapy has failed and the patient has "adequate marrow function and no evidence of marrow involvement or lymphoma;" neuroblastoma (stage II or IV) when further "conventional-dose therapy is not likely to achieve a durable remission;" and acute lymphocytic or non-lymphocytic leukemias "following the first or subsequent remission." 1 CHAMPUS Policy Manual, Ch. 3, § 6.38245.1. CHAMPUS authorized PSCR when ABMT was no longer possible: "[H]arvesting of the required stem cells by apheresis from peripheral blood [PSCR] rather than bone marrow [ABMT] can be allowed for those beneficiaries for whom it has been established that bone marrow harvesting cannot be accomplished due to documented bone marrow involvement" with cancer. Id. Whether that suggests ABMT is medically preferable to PSCR is unclear. Contra Wilson v. CHAMPUS, 65 F.3d 361, 364 (4th Cir.1995) ("PSCR is a procedure distinct from ABMT that some studies have shown to be more effective."); but see id. at 362 ("A similar, alternative procedure [to PSCR] known as an autologous bone marrow transplant ("ABMT") retrieves [stem] cells from the patient's bone marrow."). We emphasize that nothing in the record before us indicates that the effectiveness of HDC is substantially altered by the method of stem cell rescue. If anything, the record suggests that HDC with PSCR may be slightly less effective than with ABMT. See, e.g., infra note 11.
 
 
 [3]
 All clinical cancer trials occur in four phases. In Phase I the new medical procedure is tried out on human subjects for the first time, the aim being to determine the subject's maximum tolerance for a drug. In Phase II, therapies which have successfully passed Phase I are given to a larger group of individuals to determine if the procedure is efficacious for treatment of the disease. Phase III involves randomized clinical trials in which some patients receive the experimental treatment and others receive the conventional, nonexperimental treatment; the responses of the two groups are documented, analyzed and compared to assess the efficacy of the experimental treatment as compared with conventional treatments. Phase IV occurs after the drug is approved by the Food and Drug Administration and is to determine whether the drug is effective in other settings. Fuja v. Benefit Trust Life Ins. Co., 18 F.3d 1405, 1410 (7th Cir.1994)
 
 
 [4]
 In Wheeler, plaintiff sought a declaration that her primary insurer, a self-funded plan sponsored by her employer, was obligated to cover her claims for HDC/PSCR breast cancer treatment. Plaintiff had secondary insurance coverage through CHAMPUS due to her husband's prior military service. 850 F.Supp. at 461. The district court's order required plaintiff's primary insurer to cover her claim and further held that CHAMPUS was secondarily liable. Id. at 469. CHAMPUS did not appeal this ruling, id. at 637 n. 2, so the issue of CHAMPUS' secondary liability was not before the Fourth Circuit
 
 
 [5]
 Although Smith requested a preliminary injunction, the district court granted a permanent injunction instead because it believed it could not properly enter a preliminary injunction unless Smith posted a bond, which Smith claimed she was financially unable to do. However, the language in Fed.R.Civ.P. 65(C) is sufficiently flexible to permit a district court discretion in setting the amount of the bond, which could include even a nominal amount under appropriate circumstances. See Coyne-Delany Co., Inc. v. Capital Dev. Bd. of State of Ill., 717 F.2d 385, 391 (7th Cir.1983)
 Since the district court's decision, Smith has received the HDC/PSCR treatment. From what the parties told us at oral argument, we are pleased to report that she is alive and no longer undergoing treatment. The issue is not moot because CHAMPUS has not paid the hospital for the costs of this procedure. However, the future relevance of our decision is unclear. Since this case began, CHAMPUS has revised its policy manual to specifically exclude any kind of HDC treatment with stem cell rescue, whether ABMT or PSCR, for breast cancer: "CHAMPUS benefits will not be paid for ... HDC with or without ABMT, HDC with or without PSC[R] ... if not specifically listed as covered [in the policy manual]. For example, since breast and ovarian cancers are not specifically listed as covered for HDC with ABMT or PSC[R], CHAMPUS benefits are excluded." 1 CHAMPUS Policy Manual, Ch. 3, § 6.38230.1, Exclusion para. A (Nov. 21 1994) (emphasis added). With this definitive statement of policy, it is questionable whether this holding will have any impact beyond this case.
 
 
 [6]
 This panel's original opinion in this case was vacated when we granted a rehearing to reconsider the matter in light of the Fourth Circuit's holding in Wilson v. CHAMPUS, 65 F.3d 361 (4th Cir.1995). Our dissenting colleague criticizes alleged inconsistencies between this opinion and the unanimous vacated opinion. Post at 966. We decline to discuss the details of an unpublished vacated opinion. See Circuit Rule 53(b)(2)(iv); cf. Kawitt v. United States, 842 F.2d 951, 954 (7th Cir.1988)
 
 
 [7]
 The dissent seems to call for a much more vigorous judicial inquiry than our reading of the cases would allow. For instance, the dissent essentially argues at one point that CHAMPUS's inclusion of medical policy organizations and medical scientists in its interpretation of the term "general medical community"--as opposed to just oncologists--is a plainly erroneous interpretation of its regulations. See post at 965 & n. 2. It is clear to us, however, that judicial review must be very deferential, not de novo. 5 U.S.C. § 706(2)(A); Thomas Jefferson Univ., 512 U.S. at ----, 114 S.Ct. at 2386; Pozzie, 48 F.3d at 1029. In reviewing a decision by CHAMPUS, this court cannot bypass the deferential standards Congress and the Supreme Court have established, especially in a highly technical area such as this where judges have very limited knowledge. Cf. post at 967-68, 968-69 (disputing explicit conclusions of ECRI report and related news release that HDC/ABMT is experimental for treatment of breast cancer)
 
 
 [8]
 As we noted above, it is our understanding that HDC/ABMT and HDC/PSCR--which both fall under the broader label HDC/ASCR or "HDC with stem cell rescue"--are essentially the same in the treatment of breast cancer. See supra note 2; but see infra note 11
 
 
 [9]
 ECRI is a nonprofit agency established in 1955 and chartered by the Commonwealth of Pennsylvania that conducts technology assessments for government agencies, health care insurers, and managed-care providers, as well as for hospitals and clinical specialty societies. According to the policy statement accompanying its 1994 "Health Technology Assessment Report" on HDC/ASCR for the treatment of breast cancer, "ECRI reports are produced by a multi disciplinary staff of life scientists, epidemiologists, biostatisticians, engineers, information specialists, and other health professionals.... Neither ECRI nor its employees accept gifts or grants from or consult for medical device or pharmaceutical manufacturers, and each employee's IRS return is examined each year to ensure conformance with ECRI's stringent conflict-of-interest rules."
 
 
 [10]
 Differing slightly from CHAMPUS's terminology, the ECRI report appears to use the "HDC/ASCR" label to refer solely to HDC/PSCR, instead of to HDC/PSCR and HDC/ABMT. The reason for the discrepancy in terms is unclear, but it does not affect our analysis
 
 
 [11]
 The report continues: "Conventional chemotherapies have an average median survival time of 15.98±n 0.82 months (73 studies, 5,498 patients). HDC/ABMT has an average median survival time of 12.66±n 1.88 months (13 studies; 257 patients), and HDC/ASCR regimens [including HDC/PSCR] yield average median survival times of 10.81±n 1.90 months (6 studies, 170 patients)."
 
 
 [12]
 While we could attempt to argue with these conclusions, as the dissent does, post at 967-68, we simply would be taking sides in a medical dispute about which we have no independent expertise
 
 
 [13]
 For instance, in an affidavit given in September of 1994, Dr. Bogner gave the following as "the current hierarchy of the assessment sources used by the Office of CHAMPUS":
 a. Congressional direction.
 b. Outcome-based, Phase III trials published in refereed medical literature.
 c. Formal technology assessments.
 d. National medical policy organization positions.
 e. National professional medical associations.
 f. National expert opinion organizations.
 g. Regional expert opinion organizations.
 h. Individual and small group expert opinion.
 The multiplicity of sources to which CHAMPUS looks in making coverage determinations belies the suggestion that only completed Phase III trials are considered.
 
 
 [14]
 We again emphasize that CHAMPUS's initial decision to treat HDC/ASCR as experimental was rooted in scientific studies questioning its medical efficacy in the treatment of breast cancer. See ante at 957. Only after CHAMPUS had reasonably determined that the treatment was experimental and controversial did it decide that Phase III trials would be necessary to resolve the dispute. We do not have the record in Wilson, but something in it (exactly what is not clear from the opinion) convinced the court that "CHAMPUS [had] relied on an unwritten agency policy mandating Phase III trials before a treatment is provided" thus creating a rigid "prerequisite" that treatments pass Phase III trials before being deemed nonexperimental. Wilson, 65 F.3d at 366. We have found no evidence of such a sweeping prerequisite in the record before us. Rather, the record indicates that in this particular instance CHAMPUS has determined that a Phase III trial is needed to resolve this hotly debated medical issue. Nothing in the record before us suggests that CHAMPUS would have required positive results from Phase III trials if convincing studies or other persuasive medical evidence had supported HDC/ASCR for the treatment of breast cancer
 
 
 [1]
 Such a requirement would change the practice of medicine as we know it. Certainly there are treatments that are generally accepted that are not the single most effective treatment known to the medical community. A drug that costs one million times less than a drug that is only marginally more effective may be part of a treatment that is generally accepted in the medical community, even though it is not the most effective drug
 
 
 [2]
 Ms. Maxey's statements conflate the distinction between an innovative treatment whose superior effectiveness over existing treatments has been "scientifically established" and an innovative treatment that qualifies as non-experimental under CHAMPUS's regulations. As a philosophical question, we may not know the distinction between "experimental" and "scientifically established." But we do know that experimental is defined by looking to the "generally accepted standards of the usual medical profession in the general medical community." 32 C.F.R. § 199.2. Thus, if the medical community accepts a treatment as nonexperimental, it is irrelevant that philosophers (or "scientists") reserve judgment until published results appear in a refereed scientific journal
 
 
 [3]
 The majority defines "general acceptance" as "the point at which the medical value of a treatment is no longer generally disputed." Ante at 956-57. The majority does not define "medical value." From the remainder of the majority's opinion, however, it appears that the majority equates "medical value" with "effectiveness." See id. ("[W]e are probably dealing more with a zone of perceived effectiveness than a precise dividing line."); id. at 958 ("the effectiveness of ABMT was not certain"); id. at 960-61 ("while the medical controversy over the efficacy of HDC/ ASCR rages, CHAMPUS will sit tight until convincing evidence is forthcoming"). Under this definition, the ECRI report supports Smith's position. Even if HDC/ASCR is only as effective as conventional chemotherapy, it is still effective at treating breast cancer because it is better than doing nothing. CHAMPUS points to no evidence that HDC/ASCR is equivalent to or less effective than doing nothing
 
 
 [4]
 These projected results are contained in a section discussing the cost-effectiveness of HDC with ABMT. The report concludes that HDC with ABMT is 20 to 25 times more costly than standard chemotherapy. Calculating these additional costs per treatment, "HDC with ABMT saves 107.2 more years of life [for 100 patients] for $11,435,100. The cost of each additional year of life is $106,700. Similarly, it provides an additional 121.6 years of complete remission for an extra $94,000 per year.... The overall projected costs are $51,000 to $144,000 for each additional year of life and $45,000 to $127,000 for each additional year of complete remission." Id. at § 5.1. This may explain why insurers seek to deny coverage